IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC J. SMITH, | : | |
| Petitioner, | : | |
| | : | 1:15-cv-1546 |
| v. | : | |
| | : | Hon. John E. Jones III |
| KENNETH CAMERON, PA | : | |
| ATTORNEY GENERAL, | : | |
| | : | |
| Respondents. | : | |

## MEMORANDUM

### May 16, 2017

Petitioner Eric Smith ("Petitioner" or "Smith") a prisoner currently confined at the State Correctional Institution at Houtzdale, Pennsylvania, files the instant petition (Doc. 1) for writ of habeas corpus pursuant to 28 U.S.C. § 2254, following affirmation of his convictions for Robbery and related crimes. For the reasons that follow, the petition for writ of habeas corpus will be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Following a jury trial in the Court of Common Pleas of Montour County, Pennsylvania, Smith was convicted of robbery, conspiracy to commit robbery and theft, and sentenced to an aggregate term of 10 to 20 years' incarceration. (Doc. 13-3, p. 1). He filed a timely notice of appeal raising the following issues:

1.     Did the court err in denying Appellant's Motion for a Mistrial when the Commonwealth presented testimony of a police officer

containing an improper comment on [appellant's] constitutional right to remain silent?

2.     Was the Appellant denied his right to a fair trial when the District Attorney made an improper demonstration in front of the jury regarding the appearance of the individual who committed the robbery?

3.     Was the Appellant denied his right to a fair trial when the District Attorney made an improper appeal to the jury to bring back a verdict of guilty based on being "the conscience of the community" rather than basing the verdict solely on the facts of the case?

4.     Did the court err when it imposed an aggravated range sentence using as aggravated factors items which were already included as elements in the underline [sic] offense, and did the court fail to consider all mitigating factors specific to Appellant's case and individualize sentence based upon the characteristics of the Appellant?

(*Id.* at pp. 2-3).

The Pennsylvania Superior Court summarized the relevant facts as follows:

On July 14, 2008, at approximately 5:00 p.m., two individuals, a male and a female, were seen entering Ryan's Jewelers in Danville. (Notes of Testimony, 6/10/09 at 25-28). Joseph Ozelek ("Ozelek"), who was standing across the street, noticed that the male was carrying a black bag and wearing a black leather coat, unusual for a warm summer day. (*Id.* at 26). The female was dressed in a light grey business suit. (*Id.*)

Ozelek watched them enter the jewelry store, and shortly thereafter heard a scream. (*Id.* at 28.) Through the store window, Ozelek saw the female walking somebody around the back side of the counter, and the male waving his right hand up by his head. (*Id.* at 29.) At that time, Ozelek walked up the street to a nearby police station, and informed them that there was a possible robbery in progress at Ryan's Jewelers. (*Id.* at 29-30, 140.)

Two employees and one customer were in the store at the time of the robbery, and described what happened. Linda Cavanaugh ("Cavanaugh") testified that she and her co-worker, Margaret Hunsinger ("Hunsinger"), were in the process of closing the store when two African-Americans, one male and one female, entered. (*Id.* at 38.) Cavanaugh testified that they entered quickly and went straight to the counter. (*Id.* at 39.) Cavanaugh, Hunsinger, and the customer, Dr. Michelle Olson ("Dr. Olson"), were sprayed with pepper spray. (*Id.* at 39-40.) Cavanaugh testified that her face was burning and she could not see. (*Id.* at 40.) The black male told them to "shut up" and repeatedly demanded "where are the Rolexes?" (*Id.* at 40, 42.)

As Cavanaugh was bent over screaming in pain, she felt something pressing against the back of her neck. (*Id.* at 40-41.) Cavanaugh testified that she assumed it was a weapon and that "I was done." (*Id.* at 41.) In fact, the weapon was a stun gun which the male used to immobilize Cavanaugh. (*Id.* at 43.) Shortly thereafter, Officer Gerard Zeidler arrived on the scene. (*Id.* at 44.) After a short confrontation with Officer Zeidler, the intruders left and Cavanaugh called 911. (*Id.* at 47.)

Cavanaugh testified that the female was wearing sunglasses and the male was wearing a baseball hat and large black sunglasses. (*Id.* at 46.) The male's baseball hat was worn low, covering his forehead, and his sunglasses concealed a good portion of his face. (*Id.* at 46-47.) Combined with the fact that she had pepper spray in her eyes, Cavanaugh was unable to make an identification. (*Id.* at 47.)

Hunsinger also testified that the male had a baseball hat pulled down low over his eyes, preventing her from identifying him. (*Id.* at 60, 71.) The female was wearing a grey pant suit, a wig, and large sunglasses. (*Id.* at 60-61.) Hunsinger was sprayed with pepper spray and also stunned with the stun gun. (*Id.* at 63-64.) Hunsinger was shocked at least five times with the stun gun, and described it as "very painful." (*Id.* at 66.) Hunsinger testified that they were all terrified. (*Id.* at 64.)

Dr. Olson was in Ryan's Jewelers picking up a ring she had sized. (*Id.* at 82.) Dr. Olson, who is a colorectal surgeon at Geisinger Medical Center, was about to complete the transaction when she was sprayed in the face with pepper spray. (*Id.* at 81, 84). She started to make her way to the door when a male voice said, "where are you going? Get down." (*Id.* at 84, 87.) Dr. Olson testified that her face was burning and she dropped to her knees. (*Id.* at 88.) At that point, she heard the man saying, "tie them up," and her arms and wrists were duct-taped together. (*Id.* at 88-89.) Dr. Olson testified that her face felt as though it were on fire, and she could not see. (*Id.* at 89.) She was fearful that she would be permanently blinded. (*Id.* at 90.) Eventually, she heard another voice saying, "get down or I'll shoot," and after a brief scuffle, there was the sound of people running toward the back of the store. (*Id.* at 91.) As in the case of Cavanaugh and Hunsinger, Dr. Olson testified that she would be unable to identify the perpetrators due to the fact that they were wearing dark sunglasses. (*Id.* at 95.)

Officer Zeidler testified that at approximately 5:15 p.m. on July 14, 2008, he was informed by the police clerk that "someone thinks there is a robbery going on down the street." (*Id.* at 140.) He was told that it was at Ryan's Jewelers, which is only 270 feet from the police station. (*Id.* at 140-141.) After observing the actions of the two individuals through the store window, Officer Zeidler concluded that there was, in fact, a robbery in progress. (*Id.* at 142-143.)

Officer Zeidler drew his weapon, opened the door, and shouted, "Police, stop. Show me your hands. Get to the ground." (*Id.* at 143, 145.) Officer Zeidler testified that the female suspect stood still behind the counter, near the vault; the male suspect was squatting on the ground and concealing his right hand. (*Id.* at 144.) Concerned that the male was holding a weapon, Officer Zeidler continued to yell "show me your hands. Get on the floor." (*Id.* at 145-146.) Finally, when the male individual continued to refuse to obey Officer Zeidler's commands, Officer Zeidler told him "don't make me shoot you." (*Id.* at 146.) The male replied, "you are going to shoot me?" (*Id.*) Officer Zeidler stated, "not if you show me your hands and get on the floor."

(*Id.*)  At that point, the male suspect knelt down and placed both hands on the floor.  (*Id.*)

As the male slowly went down to the floor, his female accomplice started to walk out the back door.  (*Id.*)  Officer Zeidler instructed her to stop but she did not.  (*Id.* at 147.)  At that time, the male suspect leapt up and sprinted out the back door of the jewelry store.  (*Id.* at 148.)  Officer Zeidler re-holstered his weapon and gave chase.  (*Id.*)  Eventually, Officer Zeidler tackled the male suspect and, with back-up assistance, was able to handcuff him.  (*Id.* at 151).  The male individual, subsequently identified as appellant herein, had a can of pepper spray labeled "Whoop Ass" in his pants pocket.  (*Id.* at 153.)  An identical can of "Whoop Ass" red pepper spray was found behind the jewelry store counter.  (*Id.* at 118; Commonwealth's Exhibit 26.)

Officer Zeidler testified that during the chase, he never lost sight of appellant.  (*Id.* at 150, 159.)  He also positively identified appellant at trial as the person he saw in the jewelry store and the person he took into custody.  (*Id.* at 159.)

Appellant took the stand in his own defense.  According to appellant, he was on his way back to Philadelphia from Williamsport when he and two companions got lost in Danville.  (*Id.* at 179-180.)  Appellant decided to run into Ryan's jewelry to buy some hoop earrings for his daughter.  (*Id.* at 180.)  Appellant testified that while he was in the store, a woman sprayed him with pepper spray.  (*Id.* at 183.)  A male voice told him to "shut up, don't move."  (*Id.* at184.)  Appellant testified that after Officer Zeidler arrived and the unidentified woman walked out the back door, he ran after her in pursuit.  (*Id.* at 187.)  Appellant further testified:

> And, the last thing I said to the Officer after that was "don't let her get away, don't let her get away."  And a [sic] I ran out the store.  I wasn't fleeing from the [sic] Officer Zeidler.  I wasn't thinking about [O]fficer [Z]eidler.  I chased the woman, and I was screaming and yelling through the streets "help help, help, stop that car, help, stop that car."

*Id.* at 187.  Appellant testified that he was also a victim of the robbery and that he was trying to apprehend the female suspect:

> I just was screaming at the top of my lungs "help, help." A car pulled up on the side of me and I was screaming, "help, stop that car."  I don't know I don't want to offend nobody [sic], but I am running through the streets.  So, they just looked at me crazy.

*Id.* at 188.

In rebuttal, the Commonwealth recalled Officer Zeidler.  Officer Zeidler testified that he never heard appellant shouting for assistance in apprehending the female suspect:

> Q.    What assistance did he request from you in going after a third party that he was, according to his testimony, trying to chase or capture?
>
> A.    Absolutely none whatsoever.
>
> Q.    What did he tell you when you apprehended him about any woman or any person attacking him in the store?
>
> A.    Nothing.

*Id*. at 217-218.

(Doc. 13-3, 3-8).

In affirming the judgment of sentence, the Superior Court addressed each of Smith's issues on the merits with the exception of his contention that the trial court failed to consider mitigating factors when imposing sentence.  (*Id.* at pp. 8-17;

*Commonwealth v. Smith*, 24 A.3d 451 (Pa. Super. 2011) (unpublished memorandum). Because Smith failed to discuss the mitigating factors in the argument section of his brief, the Superior Court deemed the issue waived pursuant to PA.R.A.P. 2119(a). He filed a timely petition for allowance of appeal raising all of the above issues to the Supreme Court of Pennsylvania; the petition was denied. *Commonwealth v. Smith*, 612 Pa. 704, 30 A.3d 1193 (Pa. 2011).

On July 12, 2012, Smith filed a timely Post Conviction Relief Act ("PCRA") petition pursuant to 42 PA.C.S. §§ 9541-9546, which was denied following a June 10, 2013 hearing. (Doc. 13-7). His timely appeal sought review of six issues. First, he argued that his constitutional rights to a fair trial were violated because the Commonwealth withheld exculpatory evidence. (Doc. 13-11, p. 4). Second, he contended that the trial court erred in failing to offer a jury instruction in accordance with *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954). (*Id.* at 4-5). In addressing the first two issues, the Superior Court stated that the issues were "woefully underdeveloped." (*Id.* at 5). "Appellant sets forth no coherent argument for either issue; nor, in violation of Pa R.A.P. 2119, does he cite to the testimony from the PCRA hearing. Moreover, Appellant has not presented the issues properly in the context of a claim for ineffective assistance of counsel or another claim otherwise cognizable under the PCRA. Accordingly, we cannot review these

issues on appeal." (*Id.*) (footnote omitted). The remaining issues were identical to the issues Smith pursued in his direct appeal. (*Id.* at 5-6). The Superior Court noted the following:

> Appellant's next four issues, which include Appellant's post-arrest silence, an improper demonstration to the jury, improper statements in the Commonwealth's closing argument, and the imposition of a sentence in the aggravated range, are a mere recitation of the four issues Appellant raised on direct appeal. All four issues were found to be without merit on direct appeal; thus, those issues have been previously litigated pursuant to 42 PA.C.S.§ 9544(a)(2), and Appellant is not entitled to re-litigate them at this time.
>
> Because Appellant has not presented any issue which we can review on appeal, we affirm the order of the PCRA court dismissing his PCRA petition.

(*Id.* at 6). A timely petition for allocator was filed with the Pennsylvania Supreme Court and denied on May 4, 2015. (Doc. 13-14).

Thereafter, Smith pursued relief in federal court.

## II.     ISSUES PRESENTED IN FEDERAL PETITION

The instant petition for federal habeas relief was filed on August 8, 2015. (Doc. 1). Therein, Smith seeks relief on the following grounds:

1.     "Petitioner's constitutional right to a fair trial was violated because the district attorney withheld exculpatory evidence."

2.     "A new trial should be granted where the trial court failed to offer a *Kloiber* instruction."

3.   "Petitioner's constitutional rights were violated where the trial court erred when denying Petitioner's motion for a mistrial when the Commonwealth presented testimony of a police officer containing an improper comment on Petitioner's constitutional right to remain silent."

4.   "Petitioner was denied a fair trial when the district attorney made an improper demonstration in front of the jury regarding the individual who committed the robbery."

5.   "Petitioner's constitutional rights were violated where Petitioner was denied a fair trial when the district attorney made an improper appeal to the jury to bring back a guilty verdict based on being 'The conscience of the community' rather than basing the verdict solely on the facts of the case."

6.   "Petitioner's constitutional rights were violated where the honorable court erred when it imposed an aggravated range sentence using as aggravating factors, items which were already included as elements in the underlying offense and the Court failed to consider all mitigating factors specific to Petitioner's case and individualized sentence upon the characteristics of Petitioner."

(Doc. 1, pp. 7-12).

## III.   DISCUSSION

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973).  Petitioner's case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA").  28 U.S.C. § 2254, provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
...

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding....

28 U.S.C. § 2254. Section 2254 sets limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner. *Cullen v. Pinholster*, 536 U.S. 170, 181 (2011); *Glenn v. Wynder*, 743 F.3d 402, 406 (3d Cir. 2014). A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

## A.    Exhaustion and Procedural Default

Habeas relief "shall not be granted unless it appears that . . . the applicant

has exhausted the remedies available in the courts of the State."  28 U.S.C. §

2254(b)(1)(A); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  The

state courts must have the first opportunity to redress any claimed violation of a

habeas petitioner's federal rights.  *Picard v. Connor*, 404 U.S. 270, 275–76 (1971).

The habeas statute codifies this principle by requiring that a petitioner exhaust the

remedies available in the courts of the State, 28 U.S.C. § 2254(b)(1)(A), meaning a

state prisoner must "fairly present" his claims in "one complete round of the state's

established appellate review process," before bringing them in federal court.

*O'Sullivan*, 526 U.S. at 845 (stating "[b]ecause the exhaustion doctrine is designed

to give the state courts a full and fair opportunity to resolve federal constitutional

claims before those claims are presented to the federal courts,  . . .  state prisoners

must give the state courts one full opportunity to resolve any constitutional issues

by invoking one complete round of the State's established review process."); *see*

*also Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard*, 404 U.S. at 275 (1971);

*Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).

Relief cannot be granted unless all available state remedies have been

exhausted, or there is an absence of available state corrective process, or

circumstances exist that render such process ineffective to protect the rights of the applicant. *See* 28 U.S.C. § 2254(b)(1). The exhaustion requirement is grounded on principles of comity in order to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. See *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000). Significantly, federal habeas courts " 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " *Lambrix v. Singletary*, 520 U.S. 518, 522 (1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

Smith argues in Ground One that his constitutional rights to a fair trial were violated because the Commonwealth withheld exculpatory evidence. (Doc. 13-11, p. 4). In Ground Two, he contends that the trial court erred in failing to offer a jury instruction in accordance with *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954). (*Id.* at 4-5). In Ground Six, in addition to challenging the consideration of aggravating factors during sentencing, Smith argues that the court "failed to consider all mitigating factors" and impose an individualized sentence. (Doc. 1, p. 12). With respect to Grounds One and Two, as noted *supra*, the Superior Court deemed both issues waived because they were "woefully underdeveloped" and there was "no coherent argument for either issue." (*Id.* at 5). Further, Smith

failed to cite to the PCRA hearing testimony as required by PA R.A.P. 2119. (*Id.*) Respondents argue that Smith "failed to develop these issues in his appeal to the Pennsylvania Superior Court and, as a result, the same are procedurally defaulted." (Doc. 11, p. 3). Smith counters that the issues should be considered on the merits for the reasons stated in his petition (Doc. 1) and memorandum (Doc. 2). As concerns the mitigating factors portion of Ground Six, on appeal, the Superior Court deemed the claims abandoned stating that "[a] failure to develop meaningful argument in support of the claims results in waiver. PA.R.A.P. 2119(a)." (Doc. 13-3, p. 17, n 5).

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' *Kindler*, 558 U.S., at –––––, 130 S.Ct., at 615 (quoting *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. *See Sykes*, 433 U.S., at 81–82, 90, 97 S.Ct. 2497." *Walker v. Martin*, 562 U.S. 307, 315 (2011).

A state procedural rule is "independent" if it is "separate from the federal issue" and is "adequate" if it was "firmly established and regularly followed" at the

time it was applied by the state court. *Leake v. Dillman*, 594 F. App'x 756, 759 (3d Cir. 2014) (quoting *Ford v. Georgia*, 498 U.S. 411, 424 (1991)). These conditions are met when: (1) the rule invoked by the state courts "speaks in unmistakable terms," (2) "all state appellate courts refused to review the petitioner's claim on the merits," and (3) "their refusal was consistent with other decisions." *Xavier v. Supt. Albion SCI*, No. 16-1289, 2017 WL 1735244, at *2 (3d Cir. May 3, 2017) (citing *Nara v. Frank*, 488 F.3d 187 (2007)).

Grounds One and Two were first presented to the Superior Court on appeal from the denial of his PCRA petition. The Superior Court determined that Smith "sets forth no coherent argument for either issue; nor, in violation of PA.R.A.P. 2119, does he cite to the testimony from the PCRA hearing." (Doc. 13-11, p. 5). In addressing Smith's mitigating sentencing claim found in Ground Six, which was raised on direct appeal, the Superior Court deemed the claim waived based on his failure to develop meaningful argument in accordance with PA.R.A.P. 2119(a). (Doc. 13-3, p. 17, n 5).

The Third Circuit Court of Appeals recently recognized that "[t]he requirement that Petitioner must meaningfully develop his arguments on appeal and cite to appropriate authorities has been stated in unmistakable terms by the Pennsylvania Supreme Court, *see Commonwealth v. Clayton*, 572 Pa. 395, 816

A.2d 217, 221 (2002) ('[I]t is a well settled principle of appellate jurisprudence that undeveloped claims are waived and unreviewable on appeal'), and is embodied in the state's rules of appellate procedure, *see* PA. R.A.P. 2119(a)." *Xavier*, 2017 WL 1735244, at *2. It was further recognized that the Superior' Court's refusal to consider such claims on the merits "is consistent with other decisions." *Id.* citing *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 940 n. 2 (2001). *See also Leake*, 594 F. App'x. at 759; *Kirnon v. Klopotoski*, 620 F.Supp.2d 674, 683-84 (E.D. Pa. 2008) (collecting cases and holding that Rule 2119 "offer[s] clear guidelines for compliance, and careful review confirms that state and federal courts have applied these rules consistently"). Smith's failure to comply with these basic rules, and the state court's refusal to review the issues on appeal, bars the review of these issues in federal court.

Further, Smith cannot overcome this procedural default because he does not demonstrate "cause for the default and prejudice attributable thereto," or "that the failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989). *See also*, *Werts v. Vaughn*, 228 F.3d 178, 192-93 (3d Cir. 2000) (A petitioner can overcome procedural default, and thereby empower the habeas court to entertain the merits of the habeas claim, with a showing of "cause and prejudice" or by demonstrating a fundamental

"miscarriage of justice."); *see also Schlup v. Delo*, 513 U.S. 298, 321 (1995) (The miscarriage of justice exception is "explicitly tied...to the petitioner's innocence.").

### B.    Claims Adjudicated on the Merits by the State Courts

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts reviewing a state prisoner's application for a writ of habeas corpus may not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"[B]ecause the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction," *Greene v. Fisher*, 564 U.S. 34, —, 132 S.Ct. 38, 43 (2011) (internal quotations and citations omitted), "[t]his is a difficult to meet and highly deferential standard . . . which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citation omitted).  The burden is on Smith to prove entitlement to the writ.  *Id.*

A decision is "contrary to" federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A decision is an "unreasonable application" of federal law if the state court identified the correct governing legal rule but applied the rule to the facts of the case in an objectively unreasonable manner. *Renico v. Lett*, 559 U.S. 766, 773 (2010). A decision is based on an "unreasonable determination of the facts" if the state court's factual findings are objectively unreasonable in light of the evidence presented to the state court. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Finally, Section 2254(e) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### 1. *Doyle* claim

Smith asserts that following his testimony at trial, the prosecutor elicited rebuttal testimony from the arresting officer, Officer Zeidler, that impermissibly

referenced his post-arrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976); the trial court denied his motion for a mistrial. (Doc. 1, p. 10; Doc. 2, p. 6). Smith pursued the issue in his direct appeal contending that "Officer Zeidler's rebuttal testimony constituted and impermissible reference to post-arrest silence." (Doc. 13-3, p. 8).

Pursuant to clearly established federal law, a trial court has discretion to grant or deny a motion for mistrial in the absence of a showing of manifest necessity or that the ends of public justice would otherwise be defeated. *Renico*, 559 U.S. at 774 ("The decision to declare a mistrial is left to the sound discretion of the judge, but the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes."). The Superior Court recognized, *via* citations to prevailing state court law, that the decision to declare a mistrial is within the sound discretion of the court, and affirmed the denial of the motion for a mistrial. (Doc. 13-3, p. 9).

In reaching the merits of the underlying issue, the court opined as follows:

> Of course, any reference to a defendant's post-arrest silence is generally impermissible as a violation of his Fifth Amendment rights. However, in *Commonwealth v. Turner*, 499 Pa. 579, 583, 454 A.2d 537, 539-40 (1982), our supreme court observed that:
>
>> the Commonwealth must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between

silence at arrest and testimony at trial. **Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent.**

*Citing Doyle v. Ohio*, 426 U.S. 610, 619 n.11 (1976) (emphasis added [in original]). *See also Commonwealth v. Johnson*, 788 A.2d 985, 991 (Pa.Super. 2001) ("had Appellant taken the stand and testified that he made an exculpatory statement to police, the prosecution would have been able to rebut that assertion with testimony to the effect that he made no post-arrest statement.").

Appellant testified at trial that he told Officer Zeidler that he was the victim of the robbery, that he had been pepper sprayed, and that Officer Zeidler heard him yelling for help. (Notes of testimony, 6/10/09 at 187, 199, 213.) The Commonwealth was then free to call Officer Zeidler, on rebuttal, to testify that appellant never said any such thing. The purpose of Officer Zeidler's rebuttal testimony was to point out a factual inconsistency, not for impeachment. *See Johnson*, 788 A.2d at 991 ("It is impermissible to highlight an arrestee's silence on a matter for purposes of impeachment"). Therefore, the trial court did not err in denying appellant's motion for mistrial.

(Doc. 13-3, pp. 10-11). The summary of the pertinent testimony, as set forth in the

Superior Court opinion, is as follows:

[W]hile he was in the store, a woman sprayed him with pepper spray. (*Id.* at 183.) A male voice told him to "shut up, don't move." (*Id.* at 184.) [Smith] testified that after Officer Zeidler arrived and the unidentified woman walked out the back door, he ran after her in pursuit. (*Id.* at 187.) He further testified that the last thing he said to Officer Zeidler was "don't let her get away, don't let her get away." And a [sic] I ran out the store. I wasn't fleeing from the [sic] Officer Zeidler. I wasn't thinking about [O]fficer [Z]eidler. I chased the woman, and I was screaming and yelling through the streets "help help, help, stop that car, help, stop that car."

19

*Id.* at 187. [He] testified that he was also a victim of the robbery and that he was trying to apprehend the female suspect:

> I just was screaming at the top of my lungs "help, help." A car pulled up on the side of me and I was screaming, "help, stop that car." I don't know I don't want to offend nobody [sic], but I am running through the streets. So, they just looked at me crazy.

*Id.* at 188.

In rebuttal, the Commonwealth recalled Officer Zeidler. Officer Zeidler testified that he never heard appellant shouting for assistance in apprehending the female suspect:

> Q. What assistance did he request from you in going after a third party that he was, according to his testimony, trying to chase or capture?
>
> A. Absolutely none whatsoever.
>
> Q. What did he tell you when you apprehended him about any woman or any person attacking him in the store?
>
> A. Nothing.

*Id.* at 217-218.

(Doc. 13-3, pp. 7-8).

"As established by *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the right to remain silent contains an implicit promise that a defendant's post-Miranda silence will not carry adverse consequences. This promise prohibits a

prosecutor from impeaching a defendant with his or her post-Miranda silence.

Otherwise, a prosecutor could diminish a defendant's credibility by suggesting that

a defendant's silence raises suspicion, thereby burdening the defendant's right to

remain silent with a costly, unconstitutional penalty." *United States v. Lopez*, 818

F.3d 125, 126  (3d Cir. 2015).

In *Doyle*, Co-defendants Doyle and Wood were arrested and charged with

selling marijuana to a local narcotics informant.  *Doyle*, 426 U.S. 611.  Each took

the stand at his respective trial and claimed that he was framed.  *Id.* at 613.  On

cross-examination, the prosecutor asked each defendant why he had not told the

"frameup story" when arrested.  *Id.*  The Supreme Court found that "it would be

fundamentally unfair and a deprivation of due process to allow the arrested

person's silence to be used to impeach an explanation subsequently offered at

trial."  *Doyle*, 426 U.S. at 618.

In finding that the reference to post-arrest silence was permissible, the

Superior Court specifically relied on footnote 11 in *Doyle*.  The footnote states as

follows:  "It goes almost without saying that the fact of post-arrest silence could be

used by the prosecution to contradict a defendant who testifies to an exculpatory

version of events and claims to have told the police the same version upon arrest.

In that situation the fact of earlier silence would not be used to impeach the

exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. *Cf. United States v. Fairchild*, 505 F.2d 1378, 1383 (CA5 1975)." *Doyle*, 426 U.S. at 620 n.11. Note 11 speaks to the use of post-arrest silence to contradict a defendant's trial testimony of an exculpatory version of events when a defendant "claims to have told the police the same version upon arrest." (*Id.*) In this very limited circumstance, some inquiry is permitted to prevent a defendant from misleading a fact-finder about his claimed cooperation with law enforcement. Such a circumstance is not present in the matter *sub judice*. All indications are that Smith was silent up until the time he took the stand in his own defense. At the preliminary hearing, Officer Zeidler testified as follows:

> Q. Okay. When – when you took the male into custody, did you have any conversation with him at that point?
>
> A. If I did, I could not tell you what. That was a very stressful and exciting – not exciting in a good way, but a very emotional charged incident for me. And at that point it was over and I was – once Sergeant Wilt and I had him restrained and in custody, I do not remember any conversation.
>
> Q. So you don't remember any statement from the Defendant?
>
> A. No, I don't know. No.

(Doc. 14-1, p. 21). Sergeant Wilt testified at the hearing that he transported Smith to the police station and that his communication was limited to ascertaining Smith's identity. (*Id.* at 22). There is nothing in the record that demonstrates that

Smith offered Zeidler, Wilt, or any other law enforcement officer an exculpatory version upon arrest or post-arrest or that there was any level of cooperation on Smith's part.  As such, the state court improperly relied on footnote 11 in determining that the rebuttal testimony at issue was permissible and, in turn, failed to recognize constitutional error.

To be clear, calling Officer Zeidler to rebut Smith's exculpatory version of the events was entirely permissible.  "It is the proper function and purpose of rebuttal testimony to 'explain, repel, counteract, or disprove the evidence of the adverse party.' " *United States v. Mallis*, 467 F.2d 567, 569 (3d Cir. 1972) (quoting *Luttrell v. United States*, 320 F.2d 462, 464 (5th Cir. 1963)).  However, when the prosecutor posed the question "What did [Smith] tell you when you apprehended him about any woman or any person attacking him in the store?", and Zeidler responded "Nothing[,]" attention was impermissibly drawn to Smith's silence at the time of his arrest.  This is a violation of *Doyle*.  "[I]t does not comport with due process to permit the prosecution during trial to call attention to [the defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at the time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his testimony….'" *Doyle*, 426 U.S. at 619 (quoting *United States v. Hale*, 422 U.S. 171, 182–183 (1975) (WHITE, J.,

concurring in judgment)). *See also Gov't of the V.I. v. Davis*, 561 F.3d 159, 165 (3d Cir.2009); *Hassine v. Zimmerman*, 160 F.3d 941, 947–49 (3d Cir.1998).

Because the state court did not recognize the constitutional error, it did not conduct a harmless error analysis in accordance with *Chapman v. California*, 386 U.S. 18 (1967). In such an instance, the Supreme Court instructs "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705." *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). "Under the *Brecht* standard, 'habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.' " *See Sanders v. Klem*, 341 F. App'x. 839, 843 (3d Cir. Aug.6, 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 276 (3d Cir.2008) (citation and quotation marks omitted)). Therefore, in order for a trial error to justify overturning a petitioner's conviction, that error must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v.*

*Abrahamson*, 507 U.S. at 637. "[A] prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitation imposed by AEDPA." *Davis v. Ayala*, — U.S. —, 135 S.Ct. 2187, 2198-99 (2015) (citing *Fry*, 551 U.S. at 119-120). *See also Johnson v. Lamas*, 850 F.3d 119, 134 (2017).

*Brecht* involved a *Doyle* violation. In *Brecht*, the Supreme Court determined that the *Doyle* violation was harmless error because: (1) the state's references to the defendant's post-Miranda silence were infrequent, (2) they were cumulative in light of the permissible references to the defendant's pre-*Miranda* silence, and (3) the evidence of guilt was "if not overwhelming, certainly weighty." *Brecht*, 507 U.S. at 639.

In Smith's case, there was but a single reference to his post-*Miranda* silence and there were no references to his pre-*Miranda* silence. Most important is the third factor. When considering the *Doyle* error against the weight of the other evidence, the "crucial inquiry is the impact of the error on the minds of the jurors in the total setting. . . . [W]e must of necessity weigh the impact of evidence on the jury and cannot help but make a judgment as to how the jury would reasonably perceive [the defendant's] version of events with and without the *Doyle* violation." *Hassine*, 160 F.3d at 955 (internal quotations and citations omitted). Review of the

facts set forth in the Superior Court opinion which are entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), reveals that evidence of Smith's guilt was overwhelming.

Smith testified that on July 14, 2008, he witnessed a Caucasian woman in a gray suit enter Ryan's Jewelers in Danville, Pennsylvania. (Doc. 14-2, pp. 5-7, 39). Immediately thereafter, he entered the store to buy hoop earrings for his daughter. (*Id.* at pp. 6-10). He was wearing jeans, sneakers, a t-shirt, a light sweatshirt, and a baseball cap. (*Id.*) Upon entering, the Caucasian woman sprayed him with pepper spray and a male voice told him to "shut up, don't move." (Doc. 13-3, p. 7; Doc. 14-2, pp. 5-7). He testified that when Officer Zeidler entered the store he ordered him to get on the floor. (Doc. 14-2, p. 9). Then, the woman in the gray suit "just walked past the officer, walked over me and walked out the door." (Doc. 13-3, p. 8; Doc. 14-2, p. 11). Smith testified that he then ran out of the store in pursuit of the woman, not to flee Officer Zeidler. (Doc. 13-3, p. 7; Doc. 14-2, p. 12). Smith essentially testified that he was among the victims of the robbery, not the perpetrator, and that he was trying to apprehend the female suspect. (*Id.* at 8).

Conversely, Joseph Ozelek ("Ozelek") the individual that reported the robbery, witnessed a male carrying a black bag and wearing a black leather coat, and a female, who was wearing a light grey business suit, jointly enter Ryan's

jewelry store. (Doc. 13-3, p. 3). Shortly thereafter, Ozelek heard a scream. (*Id.*). He observed the male and female in the store, surmised that there was a robbery in progress, and immediately walked up the street to a nearby police station and alerted authorities. (*Id.*)

Two employees, Linda Cavanaugh ("Cavanaugh") and Margaret Hunsinger ("Hunsinger"), and one customer, Dr. Michelle Olson ("Dr. Olson"), testified that they were in the jewelry store on July 14, 2008, when two African-Americans, one male and one female, entered the store. (*Id.* at 3- 5). All three women were sprayed with pepper spray in the face and the male immobilized Cavanaugh and Hunsinger with a stun gun. (*Id.* at 4-5). The male suspect told them to "shut up" and repeatedly demanded "where are the Rolexes?" (*Id.* at 4). Cavanaugh testified that the male wore a baseball hat low, covering his forehead, as well as sunglasses that concealed a good portion of his face. (*Id.* at 4). Hunsinger testified that the male wore a baseball hat pulled down low over his eyes. (*Id.*) Dr. Olson testified that the male wore dark sunglasses. (*Id.* at 5). The male suspect's hat and sunglasses, and the effects of the pepper spray, prevented the women from identifying the suspect. (*Id.* at 4-5). The hat identified as Smith's hat worn during the robbery, was admitted into evidence. (*Id.* at 12).

The Superior Court described Officer Zeidler's testimony as follows:

Officer Zeidler testified that at approximately 5:15 p.m. on July 14, 2008, he was informed by the police clerk that "someone thinks there is a robbery going on down the street." (*Id.* at 140.) He was told that it was at Ryan's Jewelers, which is only 270 feet from the police station. (*Id.* at 140-141.) After observing the actions of the two individuals through the store window, Officer Zeidler concluded that there was, in fact, a robbery in progress. (*Id.* at 142-143.)

Officer Zeidler drew his weapon, opened the door, and shouted, "Police, stop. Show me your hands. Get to the ground." (*Id.* at 143, 145.) Officer Zeidler testified that the female suspect stood still behind the counter, near the vault; the male suspect was squatting on the ground and concealing his right hand. (*Id.* at 144.) Concerned that the male was holding a weapon, Officer Zeidler continued to yell "show me your hands. Get on the floor." (*Id.* at 145-146.) Finally, when the male individual continued to refuse to obey Officer Zeidler's commands, Officer Zeidler told him "don't make me shoot you." (*Id.* at 146.) The male replied, "you are going to shoot me?" (*Id.*) Officer Zeidler stated, "not if you show me your hands and get on the floor." (*Id.*) At that point, the male suspect knelt down and placed both hands on the floor. (*Id.*)

As the male slowly went down to the floor, his female accomplice started to walk out the back door. (*Id.*) Officer Zeidler instructed her to stop but she did not. (*Id.* at 147.) At that time, the male suspect leapt up and sprinted out the back door of the jewelry store. (*Id.* at 148.) Officer Zeidler re-holstered his weapon and gave chase. (*Id.*) Eventually, Officer Zeidler tackled the male suspect and, with back-up assistance, was able to handcuff him. (*Id.* at 151). The male individual, subsequently identified as appellant herein, had a can of pepper spray labeled "Whoop Ass" in his pants pocket. (*Id.* at 153.) An identical can of "Whoop Ass" red pepper spray was found behind the jewelry store counter. (*Id.* at 118; Commonwealth's Exhibit 26.)

[He was wearing a baseball hat when he was tackled by Officer Zeidler, which was identified as the hat worn during the robbery and admitted into evidence.]

Officer Zeidler testified that during the chase, he never lost sight of appellant. (*Id.* at 150, 159.) He also positively identified appellant at trial as the person he saw in the jewelry store and the person he took into custody. (*Id.* at 159.)

(Doc. 13-3, pp. 5-7; 12). Based on the overwhelming evidence that Smith was one of the two perpetrators of the robbery, and not a victim thereof, this Court cannot conclude that Officer Zeidler's reference to Smith's post-arrest silence, specifically, that upon apprehension, Smith told him "nothing" about "any woman or any person attacking him in the store," had a substantial and injurious effect or influence on the jury's verdict. Smith, therefore, is not entitled to habeas relief on this claim.

### 2. Prosecutorial Misconduct

Smith contends that his constitutional right to a fair trial was violated when the prosecutor engaged in improper conduct during his closing argument. He first contends that the district attorney made an improper demonstration to the jury when he placed Smith's baseball cap on his head during closing argument. (Doc. 1, p. 11; Doc. 2, p. 8). He next argues that the district attorney "made an improper appeal to the jury to bring back a guilty verdict based on being 'the conscience of the community' rather than basing the verdict solely on the facts of the case." (Doc. 1, p. 12; Doc. 2, p. 8).

The appropriate standard of review on habeas corpus for a claim of prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A court must examine the prosecutor's statements in context to determine their probable effect on the jury's ability to judge the evidence fairly, bearing in mind that arguments of counsel carry less weight with a jury than do instructions from the court. *Boyde v. California*, 494 U.S. 370, 384 (1990); *United States v. Young*, 470 U.S. 1, 11–14 (1985). Habeas relief is not available simply because the prosecutor's comments were undesirable or even universally condemned. *Darden*, 477 U.S. at 180–81; *Donnelly*, 416 U.S. at 643.

The standard of review utilized by the state court is as follows:

The standard for granting a new trial because of the comments of a prosecutor is a high one. Generally, a prosecutor's arguments to a jury are not a basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. This standard permits us to grant a new trial based on the comments of a prosecutor only if the unavoidable effect of the comments prevented the jury from considering the evidence. A prosecutor must have reasonable latitude in fairly presenting a case to

the jury and must be free to present his or her arguments with logical force and vigor.

> *Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa. Super. 2004) (citation omitted).  *See also Commonwealth v. Hood*, 872 A.2d 175,185 (Pa. Super. 2005).

(Doc. 13-3, pp. 11-12).   It is clear, and Smith does not dispute, that the state court's prosecutorial misconduct standard of review state is in accord with, and a reasonable application of, clearly established Federal law as established by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).

Nor is there any indication that the decision resulted in an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  The Superior Court set forth the following excerpt from the prosecutor's closing argument:

> Now what did he have on his head when Officer Zeidler tackled him?  This hat right here.  Think about how consistent the testimony is from Joe Ozelek.  What was the guy wearing down over his head?  Now why would anyone wear a hat like this to a jewelry store?
>
> THE COURT: Don't put it on.
>
> MR. BUEHNER:       Sorry.

Notes of testimony, 6/10/09 at 234.

(Doc. 13-3, p. 12).  The court then concluded that "[c]ertainly the prosecuting attorney could show the hat to the jury during closing arguments. The hat was identified as appellant's hat worn during the robbery and was admitted into

evidence. (*Id.* at 152, 177); Commonwealth's Exhibit 31.) Apparently, the prosecutor donned the hat to the jury to show how appellant attempted to hide his appearance as he walked into the jewelry store. Even assuming that actually wearing the hat in front of the jury was somehow improper, it did not rise to the level of prejudice requiring a new trial." (Doc. 13-3, p. 12).

(Doc. 13-3, p. 12).

Smith cites to a footnote from the state court case of *Commonwealth v. Parker*, 591 Pa. 526, 539, 919 A.2d 943, 951 (2007) and then states in conclusory fashion that "[t]he face of the record will support Petitioner's contention that prosecutorial misconduct took place in this particular instance." (Doc. 2, p. 8).

The footnote in *Parker* is as follows:

> To be clear, however, permission from the trial court to display a piece of tangible evidence during a prosecutor's opening statement will not serve as a license to display tangible evidence in any way that prosecutor sees fit. While nothing prohibits a prosecutor from displaying admissible evidence, the manner by which the prosecutor conducts the display may itself constitute prosecutorial misconduct or result in a mistrial. For instance, where the display goes beyond permissible oratorical flair, is done in a flamboyant, erratic, or frightening manner, or where the prosecutor effectively converts himself into an unsworn witness, such actions may well result in a mistrial. By way of example, *see People v. Williams*, 90 A.D.2d 193, 196, 456 N.Y.S.2d 1008, 1010 (N.Y.A.D.1982). In *Williams*, the concealability of a gun was at issue. To demonstrate that it was possible to hide the gun, the prosecutor hid the sawed-off shotgun under his clothing and pulled it out during his opening statement. The Supreme Court of New York, Appellate Division found this reversible error, holding that the demonstration converted the prosecutor into an unsworn witness. That court concluded that the prosecutor's actions created a substantial likelihood that prejudice resulted that could never be dispelled from the minds of the jury. *Id.*

(Doc, 2, p. 8, citing *Parker*, 591 Pa. at 539).  Smith fails to set forth any facts that would lead to the conclusion that the prosecutor's wearing of the baseball cap went beyond permissible oratorical flair, was done in a flamboyant, erratic, or frightening manner, or that the prosecutor converted himself into an unsworn witness, such that jury's ability to judge the evidence fairly was so infected as to make the resulting conviction a denial of due process, as required by the Supreme Court.  We conclude that the Superior Court's adjudication of the claim resulted in a decision that was based on a reasonable determination of the facts in light of the evidence presented. Consequently, he is not entitled to relief on this claim.

He also contends that the prosecutor committed misconduct when he made the statement to the jury that they "serve as the conscience of our community."  He argues the "[p]rosecuting attorneys are not allowed to incite the jurors' passions by suggesting that they act as the community's conscience to society's problem.  'A prosecutor may not urge jurors to convict a defendant in order to protect the community values, preserve civil order or deter future lawbreaking'.  *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005)."  (Doc, 2, p. 9).

In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, the court is required to examine those remarks in the context of the whole trial.  *Ramseur v. Beyer*, 983 F.2d 1215, 1239 (1992)(citing

*Greer v. Miller*, 483 U.S. 756, 766 (1987)).  The remarks must be sufficiently prejudicial in the context of the entire trial to violate a petitioner's due process rights.  *Greer*, 483 U.S. at 766 (citing *Donnelly*, 416 U.S. at 639).

The state court opined as follows:  "The prosecuting attorney is allowed a certain degree of oratorical flair and was simply reminding the jury of their responsibility.  As the trial court observed, the district attorney did not tell the jury that they had to return a guilty verdict to 'send a message' to the community.  (Notes of testimony, 6/10/09 at 245.)  In fact, as District Attorney Buehner stated, "that cuts both ways."  (*Id.*)  In other words, if the jury believed appellant's testimony and found the Commonwealth's witnesses not to be credible, they could not, in good conscience, render a guilty verdict."  (Doc. 13-3, pp. 13-14).

Smith fails to set forth any facts that would lead to the conclusion that the remark was sufficiently prejudicial in the context of the entire trial to violate his due process rights.  We conclude that the Superior Court's adjudication of the claim resulted in a decision that was based on a reasonable determination of the facts in light of the evidence presented. Consequently, Smith is not entitled to relief on this prosecutorial misconduct claim.

3.   <u>Sentencing</u>

In his final ground, Smith asserts that "the Sentence Court imposed an [sic] sentence in the aggravated range by stating that this Petitioner terrorized the victims in this case.  Petitioner asserts that the Sentence Court erred where the above stated factor is already taken into account as it pertains to the Sentencing Guidelines." (Doc. 2, p. 10).  (Doc. 2, p. 10).  He also challenges the state court's failure to provide a contemporaneous written statement of reasons for deviating from the guidelines as required by 42 PA.C.S.A. § 9721(b).  (*Id.*)  The Superior Court addressed this issue during the direct appeal as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion.  To constitute an abuse of discretion, the sentence imposed must either exceed the statutory limits or be manifestly excessive.  In this context, an abuse of discretion is not shown merely by an error in judgment.  Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

> *Commonwealth v. Mouzon*, 828 A.2d 1126, 1128 (Pa. Super. 2003) (citations and quotation marks omitted).  "It is impermissible for a court to consider factors already included within the sentencing guidelines as the sole reason for increasing or decreasing a sentence to the aggravated or mitigated range."  *Long, supra* at 751, citing *Commonwealth v. Simpson*, 829 A.2d 334, 339 (Pa. Super. 2003).

Here, the factors relied upon by the trial court in imposing an aggravated range sentence were not included in the guidelines, nor were they elements of the offense of robbery and criminal conspiracy. The trial court cited as aggravating factors that there were multiple victims (three) where appellant was convicted of single counts of robbery, criminal conspiracy, and theft; that one victim was tied up with duct tape and two were shocked with a stun gun; the evident planning involved, including the use of disguises, tools and pepper spray; and the terrorizing of the victims, particularly Cavanaugh's testimony that she thought she was about to be killed when she felt the stun gun being pressed against the back of her neck. (Notes of testimony, 7/8/09 at 7-8). Appellant went far beyond what was necessary to accomplish his goals, even using the stun gun on Hunsinger five times, after she was already immobilized. The court also cited the fact that the victims were placed in grave danger when police responded with weapons drawn. (*Id.*; trial court opinion, 5/26/10 at 2-3.) None of these aggravating factors relied upon by the trial court, including the degree of force actually used against the three victims, are elements of offenses charged. Therefore, there is no merit to appellant's challenge.

(Doc. 13-3, pp. 16-17).

A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. *Engle v. Isaac*, 456 U.S. 107, 119 (1982). Violations of state law, standing alone, will not entitle a petitioner to federal habeas relief, absent a showing that those violations are so great as to be of a constitutional dimension. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (federal habeas courts are not permitted to review questions of state law); *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977) (questions of state

substantive law not cognizable on federal habeas review); *Priester v. Vaughn*, 382 F.3d 394, 401–02 (3d Cir. 2004) (same).

Smith's sentencing claim does not implicate the laws or the Constitution of the United States. In fact, habeas challenges to a state court's sentencing discretion are unreviewable by a federal court provided that the sentence lies within the statutory guidelines, is not based upon arbitrary considerations, and the defendant's constitutional rights were not violated. *See Estelle*, 502 U.S. at 67–68 (explaining that federal habeas courts are not permitted to review questions of state law); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (same); *Wainwright*, 433 U.S. at 81 (indicating that questions of state substantive law are not cognizable on federal habeas review); *Townsend v. Burke*, 334 U.S. 736, 741 (1948) (stating that when a state "sentence [is] within the limits set by the statute, its severity would not be grounds for [habeas] relief"); *see also Jones v. Superintendent of Rahway State Prison*, 725 F.2d 40, 42–43 (3d Cir.1984) (finding that court's sentencing discretion was not cognizable in federal habeas petition); *Smith v. Kerestes*, Civ. A. No. 08–0061, 2009 WL 1676136, at *16 (E.D.Pa. June 15, 2009) (rejecting petitioner's claim that his state sentence was excessive because "absent a Constitutional violation, a federal court has no power to review a sentence in a habeas corpus proceeding unless it exceeds statutory limits"). The Superior Court held that Smith's sentence

fell within the aggravated range of the applicable state sentencing guidelines and that the sentence was based upon facts specific to the offenses for which he was convicted. Accordingly, this sentence was applied within the broad limits established by the Constitution, and his claim concerning either the length, or discretionary imposition, of his sentence fails to raise a cognizable claim for federal habeas relief.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322 (2003). Petitioner fails to demonstrate that a COA should issue.

The denial of a certificate of appealability does not prevent Smith from appealing the order denying his petition so long as he seeks, and obtains, a

certificate of appealability from the Third Circuit Court of Appeals. *See* FED. R.

APP. P. 22(b)(1), **V.** **CONCLUSION**

For the reasons set forth above, the petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 will be denied.

A separate order will enter